U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

NOV 1 9 2019

TONY R. MOORE, CLERK
BY _____ WA _____
               DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

_____ DIVISION

UNITED STATES OF AMERICA                    CIVIL ACTION # ___5:19-cv-1504___
THE STATE OF LOUISIANA
AND 14 OTHER STATES                         JUDGE _____
*ex rel* TERENCE JAMES ALOST
     Plaintiff/Relator                      MAGISTRATE JUDGE _____

VERSUS

DESOTO REGIONAL HEALTH SYSTEM FOUNDATION (DRHS)      FILED *IN CAMERA*
EMERGENCY STAFFING SOLUTIONS, INC. (ESS)                AND UNDER SEAL
HOSPITAL CARE CONSULTANTS, INC. (HCC)
TODD EPPLER, FACHE, CEO (DRHS)                   DO NOT ENTER IN PACER
SHELLY STEWERT, VICE PRESIDENT, ESS
     Defendants


### COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND THE LOUISIANA MEDICAL ASSISTANCE PROGRAM INTEGRITY LAW AND THE EQUIVILENT HEALTHCARE FRAUD LAWS OF TEXAS, NEW MEXICO, COLORADO, OKLAHOMA, ARKANSAS, MISSOURI, ILLINOIS, KENTUCKY, TENNESSEE, NORTH CAROLINA, SOUTH CAROLINA, GEORGIA, ALABAMA AND MISSISSIPPI


Plaintiffs, the United States of America, the State of Louisiana, possibly

fourteen other states, through the Relator, Terence James Alost, who is a citizen

of Louisiana and whose mailing address is 2772 Windrush Way, Baton Rouge, LA

70809 submit this Complaint for Damages as follows:

## JURISDICTION AND VENUE

1. This is a *Qui Tam* action brought on behalf of the United States Government, through the Centers for Medicare and Medicaid Services ("CMS"), 31 USC § 3729, the Department of Defense for Tricare payments, the appropriate US agency for the Veterans Healthcare Administration payments, the State of Louisiana, and possibly fourteen other states against Defendants pursuant to the Federal False Claims Act, equivalent US laws concerning Tricare and Veterans Healthcare Administration fraud, the Louisiana Medical Assistance Programs Integrity Law, LSA R.S. 46:437.1 *et seq* and equivalent state healthcare fraud laws of the 14 other states.

2. This Court has jurisdiction for this action and these claims arising under the laws of the United States pursuant to 28 USC § 1331 *et seq*.

3. This Court has jurisdiction for this action in which the United States is a Plaintiff pursuant to 28 USC § 1345.

4. This Court has jurisdiction of the claims asserted in this action by the Federal False Claims Act.

5. This Court has jurisdiction of the pendent State claims asserted in this action under the express provisions of the Federal False Claims Act, 31 USC § 3732, and the general pendent jurisdiction of this Honorable Court.

6. Venue lies in this district under 31 USC § 3732 because the some of the Defendants can be found in this district, all Defendants transact business in this district, and some of the acts proscribed by 31 USC § 3729 *et seq*. occurred in this district.

## THE PLAINTIFFS

7. The Plaintiff, the United States of America by and through its departments, the Department of Health and Human Services ("HHS"), including the Centers for Medicare and Medicaid Services ("CMS") within the HHS. The United States of America is responsible for administering Federal and Health Care Programs including Medicare, Medicaid, Tricare and Veterans Health Administration benefits.

8. The Medicaid Program is a State and Federal Assistance Program to provide payment of medical expenses for low income and disabled beneficiaries. Medicaid Program funding is shared by the Federal Government and those states participating in the program. The primary purpose of the Medicaid Program is to enable each state to furnish medical assistance on behalf of families with dependent children, the aged, blind or disabled individuals, whose income and resources are insufficient to meet the cost of necessary

medical services.  Nearly 75 million Americans were estimated to be enrolled in the Medicaid program as of 2018.

9.  The Plaintiff, State of Louisiana, by and through its Department of Health and Hospitals, particularly the Louisiana Medicaid Program, is responsible for administering the joint and federal-state health care program known as Medicaid in the State of Louisiana.  In July of 2018, there were approximately 1,500,000 Louisiana Medicaid recipients[1].

10.  The Plaintiffs, the States of Texas, Oklahoma, Colorado, New Mexico, Arkansas, Missouri, Illinois, Kentucky, Tennessee, North Carolina, South Carolina, Georgia, Alabama and Mississippi have similar Medicaid programs in their states.  The estimated July 2018 number of Medicaid recipients in those states were: TX 4,300,000, OK 800,000, CO 1,300,000, NM 700,000, AR 900,000, MO 900,000, IL 2,900,000, KY 1,200,000, TN 1,400,000, NC 2,000,000, SC 1,000,000, GA 1,800,000, AL 900,000 and MI 600,000 recipients.

11. Upon information and belief, the Defendants derive a substantial portion of their revenue from the Medicare, Medicaid, Tricare and VHA benefit programs.  A smaller percentage of their revenue is from health insurance

---

[1] Medicaid recipient numbers from www.healthinsurance.org.

particular in a rural area like Desoto Parish covered by Defendant DRHS.

Additionally, Defendants ESS and HCC declare that they specialize in rural

emergency and hospital medicine in Louisiana and 12 to 14 other states.  A

higher percentage of rural healthcare recipients have Medicare and

Medicare as their payment form than in the more affluent suburbs of cities.

If a hospital or health care provider is near one or several large military

installation(s), then that hospital or health care provider will see a higher

percentage of patients who have Tricare or VHA benefits.  There are several

military bases in central and northwestern Louisiana.  There may be large

military bases near other hospitals affiliated with ESS and HCC in the other

12 to 14 states where they operate.

## THE DEFENDANTS

12. Defendant Desoto Regional Health Systems Foundation (DRHS) is a

hospital and set of outlying clinics in Desoto Parish.  Per

www.desotoregional.com, it serves patients in "DeSoto, Sabine, and Red

River Parishes, parts of East Texas, and beyond."  In addition to the outlying

clinics, the principal place of business is in Mansfield.  This Defendant may

be served at 207 Jefferson Street, Mansfield, LA 71052.

13.  Defendant Emergency Staffing Solutions, Inc. (ESS) is an emergency

department contract management organization.  It obtains the emergency

department contract at client hospitals.  It hires healthcare providers to

work in those hospital emergency departments.  Some of those healthcare

providers may be employees and others may be independent contractors.

ESS, itself, does not have any apparent physician management, physician

directors or physician advisors.  Without physician supervision, ESS can run

its business like any other business: Profit is more important than patient

safety.  ESS sends bills to Medicaid, Medicare, Tricare, VHA, insurance

companies and "self-pay" patients for the services provided by its

healthcare providers.  According to www.essdoc.com, ESS has been in

business 18 years and manages contracts in 78 hospitals in 13 states.  The

Defendant may be served at 17304 Preston Road, Suite 1400, Dallas, TX

75252.

14.  Defendant Hospital Care Consultants, Inc. (HCC) was founded in 2003 to

manage contracts for the inpatient care within contracted hospital

facilities, similar to the functions of ESS in its client hospitals. According to

the website www.hccdoc.com, HCC manages contacts in "over 50 facilities"

According to that same website, it is licensed in 14 states, not including

Louisiana. (Exhibit 1, map)  According to their website, HCC does not

appear to have any physicians in management or as advisors.  Defendants

ESS and HCC share the same office and share many of the same personnel.

The Defendant may be served at the same location as the Defendant ESS

(above).  Additionally, the registered office for HCC in Louisiana is 3867

Plaza Tower Drive, 1st Floor, Baton Rouge, LA  70816.  It is likely that the

Defendant may be served there.

15.  Defendant Todd Eppler, FACHE, is a person of the full age of majority and

is most likely a resident of the State of Louisiana.  He may be served 207

Jefferson Street, Mansfield, LA 71052 or any other place that he may be

found within this district.

16. Defendant Shelly Stewert is a person of full age of majority.  She, most

likely, is a resident of the State of Texas.  She may be served at 17304

Preston Road, Suite 1400, Dallas, TX  75252.

**THE RELATOR**

17.  The Relator Terence James Alost, MD MBA FAAEM (hereinafter "Relator")

is a person of the full age of majority and a resident of the State of

Louisiana, Parish of East Baton Rouge.  Relator entered into a contract in

December 2018 to provide Emergency Medical physician coverage at

Desoto Regional in Mansfield, LA as an independent contractor under Defendant ESS.  A few months later, Defendant ESS convinced Relator to also provide Emergency Medical physician coverage at another ESS contract: Lasalle General Hospital in Jena, LA.  Relator's first and last shifts at Desoto Regional were January 7, 2019 and June 22, 2019 respectively.  Relator's first and last shifts at Lasalle General were April 23, 2019 and September 8, 2019, respectively.  Relator is a board-certified Emergency Medicine physician, licensed in Louisiana since August 9, 1988.  Relator's principal address is 2772 Windrush Way, Baton Rouge, LA  70809.

18. Relator has attached documentation, including exhibits, to this complaint which is incorporated by reference as if pled herein.

19. Relator will provide a disclosure to the Government of any and all evidence in his possession relating to this case as is required by the False Claims Act and to the Louisiana Department of Justice.

20.  Relator is submitting this "COMPLAINT FOR DAMAGES" in proper person. He is not an attorney.  Relator does not yet know any attorneys that can practice in Federal Court.  Relator reserves the right to locate and obtain legal representation in this matter.

21. Relator is a board-certified specialist in Emergency Medicine having practiced Emergency Medicine for three decades.  He is an expert in Emergency Medicine.  He reserves the right, individually and as co-plaintiff with the United States of America, the State of Louisiana and the 12 to 14 other States, to obtain expert opinions from board-certified experts in the following fields that care: Emergency Medicine, Hospital Medicine, Family Medicine, Internal Medicine, Psychiatry, Neurology, Cardiology, Pulmonology, Critical Care, General Surgery, Cardiothoracic Surgery and other specialties to be determined after completion of full discovery.

22. Relator reserves the right to amend the complaint and attach any additional documentation should the Government so desire or, alternatively, have an attorney do it for him.

### FACTS AND ALLEGATIONS OF THE CASE

23.  In 2017, Defendants began working on a planned "Nurse Practitioner Hospitalist Program".  Non-physicians had provided healthcare as employees or contractors of Defendant DRHS for some years.

24.  Relator has specific and independent information that when the physicians on the medical staff were asked to consider the proposed "Nurse Practitioner Hospitalist Program" that there was considerable disagreement

that the plan was a good one.  There was not universal agreement that the plan should go forward[2].

25.  Around that time, Defendants contacted Bossier City attorney Pam Breedlove to ask her for an opinion letter supporting the "Nurse Practitioner Hospitalist Program".  She provided it on October 9, 2017.

26.  In early December 2018, Julie Tusa, physician recruiter for Defendant ESS contacted Relator to see if he would be interested in providing some part-time Emergency Department physician coverage for the ED in Mansfield at the hospital of Defendant DRHS.  An agreement was reached in which Relator and Defendant would agree upon shifts and that Relator would be paid $135/hr plus hotel costs.  A contract was signed by both parties.

27. Relator worked his first shift in the Desoto Regional Emergency Department on January 7, 2019.  At the time that Relator worked his first shift and for several months thereafter, he had no knowledge of the planned "Nurse Practitioner Hospitalist Program".  Although it was planned, it was not in effect yet.  At that time, admissions to Defendant DRHS were divided between Dr. Benjamin Leggio, a licensed physician trained in Family

---

[2] There still is not universal agreement amongst the Desoto Regional full-time physician staff that the plan is good. At least one of the fulltime staff firmly told the Relator that he felt the plan was unwise and unsafe and placed patients at risk for harm.

Medicine, and Dr. Denis Kamberov, a licensed physician trained in Internal Medicine.  These two physicians also provided primary care coverage at the Desoto Regional Family Medicine Clinic just across the street from the hospital.  In the opinion of the Relator, Drs. Leggio and Kamberov did a fine job caring for the patients admitted for in-patient care at Defendant DRHS.

28.  The "Nurse Practitioner Hospitalist Program" began at Defendant DRHS in May or June 2019.  The newly hired healthcare providers who would be the hospitalists were Dr. Desai, a specialist in Internal Medicine, and Caleb, a nurse practitioner.

29.  While working a shift in the Desoto Regional on June 17, 2019, Relator encountered, treated and diagnosed two patients that needed admission to a hospital: either at Desoto Regional or to one of the larger hospitals in nearby Shreveport.  Relator asked that the Hospitalist service be paged. The call was answered by Nurse Practitioner Caleb.  Without asking many clinical questions, Caleb agreed to accept both patients to the hospitalist service.  (Normally, emergency medicine specialists and consultants in other specialties discuss and, sometimes, vigorously debate over the telephone what to do with any given patient based upon clinical presentation and data obtained during the emergency department

evaluation.  Often, there is easy agreement about the appropriate

disposition for a given patient.  Sometimes, there is not initial agreement at

all.  Eventually, with rare exception, however, the two physicians do come

to an agreement.  This is the standard practice of medicine throughout the

United States of America.)

30. Believing that Caleb, by Louisiana law, had to be under the collaboration

and supervision of Dr. Desai, Relator entered orders into the computer for

admission to that physician.  Upon entering those orders, Relator noticed

that Nurse Practitioner Caleb was listed as one of the choices that could be

picked, in the computer system, as the "admitting physician".  Relator

found that quite peculiar.  First, Caleb isn't a physician.  Second, Relator

knew, at that point, that such a thing was probably illegal.  In any event,

Relator, at that point, just figured that it was an error by whomever in the

hospital IT department had designed the computer ED→In-patient

admission orders.

31. Within minutes, employees for Defendant DRHS confronted Relator and

instructed him to "change the admitting physician" to Caleb.  Feeling that

such an action was unwise, unsafe and illegal, Relator refused twice.

32. Relator became concerned that something was amiss.  He feared that the

patients he had just admitted to Nurse Practitioner Caleb would be

mismanaged.  For example, one of the patients that Relator admitted to

Caleb had suffered a cerebrovascular accident, otherwise known as a

"stroke".  There are standard tests and procedures that physicians learn in

their training in either Internal Medicine or Family Medicine as part of the

initial evaluation and treatment of stroke patients.  Such physicians learn

this subject matter in their 4 years of pre-medical education, 4 years of

medical school followed by 3 clinical years in their specialty-specific

residency programs.  In residency, physicians learn their specialty:  Their

education is specific:  OBGYNs become experts on delivering babies.

Neurosurgeons become experts at doing brain surgery.  All neurosurgeons

delivered a few babies in their medical school training days.  They don't do

it in their practice however.  If a lady would go into labor on a trans-oceanic

flight and the only health care provider on the plane was a neurosurgeon,

then it would be that physician's duty to step up and nervously help out.

33.  In contrast, Nurse Practitioners do not complete the same rigorous

science-based medical education to become a nurse.  Then, following that,

a nurse attends a program to become a nurse practitioner.  While there is

great uniformity in US medical schools and residency programs, there is not uniformity in US Nurse Practitioner degree programs. Some Nurse Practitioner Degree programs are excellent and they turn out highly-competent excellent Nurse Practitioners. Some Nurse Practitioner Degree programs are basically correspondence courses. It is not easy for the public to tell the difference. It is not easy for physicians to immediately tell the difference between a well-trained nurse practitioner and one that was poorly-trained. However, even well-trained nurse practitioners do not have the specialty specific years of training that physicians must undergo to practice independently. The training of a nurse practitioner is shorter and less rigorous.

34. Relator became worried that the patients he had admitted would not receive care from a physician any time soon. This worried the Relator. Relator then decided that he should order tests that were beyond his specialty of Emergency Medicine and that normally would be ordered by a Hospitalist physician soon after the patient was admitted.

35. Once such test for the stroke patient was a "swallowing test". Normally, people have a functional epiglottis which closes over and protects the airway and lungs when they swallow. After a stroke, especially a severe

one, some patients have a dysfunctional epiglottis.  It does not close and protect the airway when the patient tries to swallow food or fluids.  Those foods and fluids will enter the lungs with catastrophic consequences including aspiration pneumonia, sepsis, disability and possibly death.  Trained and experienced healthcare providers order a "swallowing test".  If the patient fails that test, then they should not be allowed to eat or drink.  Instead, they should receive intravenous fluids for hydration and a feeding tube, either through the nose or surgically through the abdominal wall directly into the stomach.

36. To the best of his recollection, knowing these things, Relator asked the nurses to order and facilitate a "swallowing test".  The first nurse answered, "What's that?"  A second more experienced nurse answered, "We don't do that here anymore."  **Relator's concerns for the safety of the patients that he had just admitted to the hospital increased.**

37. Relator was disturbed by the fact that multiple hospital employees had instructed him to commit an act that he felt was dangerous for patient care, putting the patient's life at risk as well as committing healthcare fraud, Relator e-mailed Defendant Todd Eppler to express his concerns at 2:11pm on June 18, 2019.

38.  Defendant Todd Eppler's rapid e-mail response at 2:37pm was crystal

clear: Admit the patient as instructed to the Nurse Practitioner or be

terminated.  In the response/threat e-mail, Defendant Todd Eppler

included the October 9, 2017 opinion letter from the Pam Breedlove law

firm.

39.  Relator was startled by that response and figured that there must have

been things going on that he had no knowledge of.  He contacted full-time

Desoto Regional physicians to ask.

40.  The first staff member that he contacted stated that he, personally, also

was opposed to the planned program but that he and others relented when

they were informed that the Breedlove opinion letter declared that the

planned program was fine.

41.  Relator assured that physician staff member that the letter was wrong.

Louisiana is not an independent practice state for nurse practitioners.

42.  Relator was invited to call in from Baton Rouge to the next medical staff

meeting, there in Mansfield, to discuss the Hospitalist program.

43.  Relator called in a presented his argument as to why Defendants were

doing something foolish, dangerous and illegal.

44. Shortly after Relator spoke, another physician spoke to defend the program. Although the reception for the conference call was not great[3], Relator believes that the other physician asserted that the following groups had declared the new program to be legal:

    a. The Louisiana State Board of Nursing

    b. The Louisiana State Board of Medical Examiners

    c. Dr. Vince Culotta, Executive Director of the Louisiana State Board of Medical Examiners

45. Relator was startled and emailed Dr. Culotta Friday afternoon, June 21, 2019, to ask if these statements were true.

46. Dr. Culotta responded at 5:58 am, first thing Monday morning, June 24, 2019, that it was not true. He asked Relator to attend the July 15, 2019 meeting of the LSBME to discuss the matter in front of the Board. Relator responded that he would be out of the country on that date. It was agreed that Relator could send in the matter for discussion via written letter presentation. The presentation to the Board is attached. (Pages 3-21 of the exhibits.) Included, in that presentation, was a legal opinion by Carolyn Buppert, MSN, JD for the national publication, *Medscape*. (Pages 19 & 20

---

[3] Relator asked for a transcript of the meeting. This was not provided.

of the exhibits)  She answered this question, "In a hospital setting, where a nurse practitioner is acting as a hospitalist, can the nurse practitioner be considered the 'attending' for billing purposes if no other physician hospitalist visited the patient?"  Healthcare attorney Buppert's answer was to the point: "No."  She went on further to explain that it would violate rules coming from Medicare's "Conditions of Participation".

47. The matter was discussed at the next meeting of the Louisiana State Board of Medical Examiners and was referred for legal opinion to attorneys for the Board.

48. On October 18, 2019, the LSBME responded.  The determination is attached.  (Exhibit 4, pages 24-28 of the exhibits)  Pertinent points are as follows:

   a. The unsupervised practice of medicine by a nurse practitioner (without a physician being a phone call away) is illegal in Louisiana.

   b. It appears that the unsupervised practice of medicine (without a physician being a phone call away) is illegal for all Medicare patients in every US State.  That would even include the states where HCC is licensed that do have independent practice rights for nurse practitioners:  New Mexico and Colorado.  (See exhibits, page 2)

    c. The LSBME has no authority when a nurse practitioner or hospital in Louisiana violates the law.

    **d.** Instead, violations of such laws are regulated and punished by state and federal regulators.  (**I.e. the co-plaintiffs in this lawsuit**.)

49. Other groups also do not compensate unsupervised nurse practitioners. For example, Blue Cross and Blue Shield does not recognize NPs and NP-PCPs as hospitalists.  (See exhibits, page 29, under Policy)  Blue Cross only reimburses physicians for hospitalist services rendered directly to members.  How would a hospital or contracted management group in Massachusetts get paid when the hospital or management group provides in-patient hospitalist coverage by an unsupervised nurse practitioner hospitalist?  Easy:  Lie about it and bill under a physician's NPI number.  It's fraud.  Such fraud against BCBS works quite well until that provider gets caught.  Massachusetts BCBC outlines the rules for a MD/NP hospitalist team:

    a. The NP must be a BCBS provider

    b. The physician must be on-site when the care is rendered.

    c. The physician must be actively involved in the patient care decision-making process.

50.  Lastly, the Louisiana Attorney General's office has <u>already</u> prosecuted

cases just like this one. Per their web-page

([https://www.ag.state.la.us/MedicaidFraud](https://www.ag.state.la.us/MedicaidFraud)):

Medicaid Fraud involves the intentional submission of a false or fraudulent claim to the Louisiana Medicaid program.

**The three primary Medicaid fraud schemes are:**

1.  Providers who bill the government for services they never performed.
2.  Upcoding- Providers who bill the government for more expensive services than they actually performed.
3.  Kickbacks- Providers who make illegal payments to third parties in exchange for business or referrals billed to Medicaid

**Examples of Medicaid Fraud prosecuted by the MFCU in the past:**

- **A Kid-Med clinic in the New Orleans area submits billings for physician office visits when the clinic has <u>no licensed physician</u> on staff.**
- **A physician bills Medicaid for face-to-face office visits when she was vacationing outside the United States.**

## INTENTIONALLY MISLEADING THE PUBLIC AND/OR
## ACTING IN AN UNSCRUPULOUS FASHION

51. Evidence that Defendants are willing to act in a misleading or unscrupulous

fashion can be seen from both their actions and from their websites.  For

Defendant DRHS:

a. Defendant DRHS lists all of its healthcare providers on its
"Physicians" page.  Four of the healthcare providers listed on that
page are not physicians: Two are nurse practitioners, one is a social
worker and one is a physician's assistant apparently working
independently in a clinic on the Texas border in Logansport, LA.  (See
exhibits, page 10)  Many in the general public do not understand that
those four healthcare providers are not physicians.  They will simply
believe what the hospital tells them.

b. Until they changed it, nurse practitioner Larry Allen was listed as a
psychiatrist, trained at Tulane and double board-certified by the
American Board of Family Medicine and by the American Board of
Psychiatry and Neurology.  In reality, Larry Allen did not train at
Tulane and he is not board-certified by either board.  Defendant
DRHS cannot resist being remaining dishonest to the public,
however, even in "correction".  The website now specifies that Mr.
Allen received his "Medical Education" from the "St. Louis University
School of Medicine".  (See exhibits, page 21)  Nurse practitioners do
not take courses in medical education at the St. Louis University
School of Medicine.  It is possible, however, to take an on-line course

to become a Psychiatric Mental Health Nurse Practitioner from the
St. Louis University School of *Nursing*.  This is most likely the degree
that Mr. Allen possesses.  This is misleading to the public.

52. Evidence that Defendants ESS/HCC are willing to act dishonestly and not
honor contracts can be seen in the way that the Relator was terminated.

    a.  Defendant and Relator agreed that Relator would work 3 days in July,
2019.  The sudden last-minute termination, without due process, by
Defendant Shelley Stewert violated that agreement and was an
immediate loss of income for Relator of $4,860.  Defendant Shelley
Stewert would not provide written confirmation for the reason for
the termination even when it was requested.

    b.  Additionally, Defendant ESS/HCC, by contract originating in
December, 2018, agreed to reimburse Relator for hotel costs.
Relator repeatedly sent messages to Defendant requesting that the
hotel costs, per contract, be reimbursed.  Communications were
ignored.  Total unreimbursed hotel expenses are $2,427.61.

    c.  These unreimbursed amounts are something more appropriate for
"Small Claims Court" than for federal court, perhaps.  That, however,
is not the point.  This is the point:  If Defendants are unscrupulous

enough to cheat on their contract with the Relator, what is to

prevent them from also cheating, when they feel like it and think that

they can get away with it, on other contracts such as contracts with

the federal and state governments or with insurance companies?

## DEFENDANTS ESS AND HCC ARE IN 12 TO 14 OTHER STATES

53. Relator is only witness to the operations of Defendants ESS and HCC in

Mansfield and Jena, Louisiana.  Relator knows that they are complicit with

healthcare fraud in Mansfield.

54. Defendant ESS, per its website, states that it has contracts in 13 states with

78 hospitals.

55. Defendant HCC, per its website, claims to be licensed in 14 states, not

including Louisiana, as shown on the map in Exhibit 1.

56. Relator knows of healthcare fraud by Defendants in Mansfield, LA.  Is it

widespread throughout the ESS and HCC contracts?  Full discovery will

reveal the answer to that question.

WHEREFORE, Plaintiffs and Relator pray as follows:

57. Relator prays for a trial by jury in this matter.

58.  An order that Defendants cease and desist from submitting and/or causing the submission of any further false claims or from otherwise violating 31 USC § 3729 *et seq* and LSA R.S. 46:437.1 *et seq*.

59.  An order that Defendants cease and desist from misleading the general public, as well as payors for healthcare, (The US government, the State governments, insurance companies and self-pay patients) as to whom is providing healthcare at their facilities.  (I.e. Non-physicians should not be called "physicians", for example.  If non-physicians are providing health care, either legally or, worse, illegally, this should be revealed to both the patients and the payors.)

60.  Judgement for the United States of America, the State of Louisiana and the 12 to 14 other States where Defendants provide healthcare in the amount of each and every false claim or false statement or false claim submitted until multiplied as provided by 31 USC § 3729 and LSA R.S. 46:437.1 *et. seq*. and the equivalent laws of the 12 to 14 other states, plus a civil penalty of not less than FIVE THOUSAND FIVE HUNDRED AND NO/100 ($5,500.00) DOLLARS nor more than ELEVEN THOUSAND AND NO/100 ($11,000) DOLLARS per false claim or statement, as provided by 31 USC § 3729 and LSA R.S. 46:437.1 et. seq., to the extent such multiplied penalty

shall fairly compensate the United States of America, the State of Louisiana and the 12 to 14 other States for losses resulting in the various schemes undertaken by the Defendants together with penalties for specific claims to be identified at a trial on the merits after full discovery.

61. Judgement for the Relator awarding him the maximum shares allowed pursuant to the Federal False Claims Act and the Louisiana Medical Assistance Programs Integrity Law cited and referenced hereinabove as well as comparable maximum shares allowed pursuant to the relevant qui tam laws of the other 12 to 14 States.

62. Judgement for the United States of America, the State of Louisiana, the 12 to 14 other States and the Relator against the Defendants awarding them all costs, including, but not limited to court costs, expert fees, and all reasonable attorney's fees incurred in the prosecution of this action.

63. Judgement for the United States of America, the State of Louisiana, the 12 to 14 other States and Relator against Defendants for any and all of the damages available to them as a result of Defendants' violations of the Federal False Claims Act, the Louisiana Medicaid Assistance Programs Integrity Law and the equivalent laws of the 12 to 14 other States, and

available to them pursuant to any other claims or causes of action arising

under the statutes, common law, civil law, equity, or usage, and:

64.  Such other further general, equitable, and legal relief as justice so

requires.

Respectfully submitted,

Terence James Alost, MD MBA FAAEM
Appearing before this Honorable Court, *pro se*
2772 Windrush Way
Baton Rouge, LA  70809
Telephone: (225) 205-4111
Alternative: (225) 776-0405
E-mail: tjalost@aol.com