U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

FEB - 4 2020

TONY R. MOORE, CLERK
BY _____
                    DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## SHREVEPORT DIVISION

UNITED STATES OF AMERICA            CIVIL ACTION #5:19-cv-01504
THE STATE OF LOUISIANA
AND 14 OTHER STATES                 JUDGE TERRY A DOUGHTY
*ex rel* TERENCE JAMES ALOST
    Plaintiff & Relator          MAGISTRATE JUDGE KAREN L HAYES

VERSUS

DESOTO REGIONAL HEALTH SYSTEM FOUNDATION (DRHS)     FILED *IN CAMERA*
EMERGENCY STAFFING SOLUTIONS, INC. (ESS)            AND UNDER SEAL
HOSPITAL CARE CONSULTANTS, INC. (HCC)
TODD EPPLER, FACHE, CEO, DRHS                        DO NOT ENTER IN PACER
SHELLY STEWERT, VICE PRESIDENT, ESS
    Defendants


## AMENDED COMPLAINT FOR DAMAGES PRIMARILY UNDER THE FEDERAL FALSE CLAIMS ACT AND THE LOUISIANA MEDICAL ASSISTANCE PROGRAM INTEGRITY LAW AND THE HEALTHCARE FRAUD LAWS OF TEXAS, NEW MEXICO, COLORADO, OKLAHOMA, ARKANSAS, MISSOURI, ILLINOIS, KENTUCKY, TENNESSEE, NORTH CAROLINA, SOUTH CAROLINA, GEORGIA, ALABAMA AND MISSISSIPPI

## AND

## SECONDARILY FOR INDIVIDUAL CAPACITY CLAIMS FOR CONTRACT VIOLATIONS BY DEFENDANTS AGAINST TERENCE JAMES ALOST, MD MBA FAAEM

# TABLE OF CONTENTS

**Page**

**Complaint**
1. Jurisdiction and venue                                            4-6
   a.  Healthcare fraud                                              4-5
   b.  Individual capacity claim                                     5-6
2. Plaintiffs (Healthcare fraud)                                     6-8
3. Defendants                                                        9-11
4. Relator and Plaintiff for individual capacity claim              11-14
5. Facts and Allegations of the case                                15-30
6. Business Model of ESS/HCC                                        30-40
   a.  Tragedy in El Reno, Oklahoma                                 33-37
   b.  Cost saving of replacing physicians with non-physicians     38-39
7. Why this matters:  Patients will be harmed                      40-42
   a.  Things that cannot be learned in an online course           41
   b.  It is fraud either way.                                      42
8. Stark law violation                                              42
9. Comparison to previously prosecuted healthcare fraud cases      43-48
10. Evidence of deceit and dishonesty                               48-53
11. Defendants are in 13 to 15 states                               54
12. Prayer                                                          54-57
    a.  Healthcare fraud                                            54-56
    b.  Individual capacity claims                                  57

**Exhibits**
1. Map of licensure for Defendant HCC                               2
2. NP Scope of Practice by state                                    2
3. Submission to the LSBME on July 2, 2019                          3-21
   a.  Specific questions to the LSBME                              9
   b.  Desoto Regional healthcare providers                        10
   c.  E-mail expressing concern about legality & safety of plan   10-11
   d.  Threat to comply or be terminated by Todd Eppler            12
   e.  Opinion Memorandum by Pam Breedlove JD                      13-16
   f.  Delay in diagnosis, breast cancer by unsupervised NP        17-18
   g.  Legal Opinion by Carolyn Buppert, MSN JD                    19-20
   h.  False advertising by Desoto Regional                        21
4. Letter of concern from AAEM President-Elect to the LSBME        22-23

5.  Response from the LSBME on October 18, 2019 — 24-28
6.  Payment Policy concerning nurse practitioners by Blue Cross — 29-31
    a.  Non-recognition of NPs as hospitalists — 29
    b.  Non-recognition of NPs as psychiatrists — 29
    c.  Rules for Physician-NP teams — 30
7.  Contracts for Compensation, malpractice insurance and hotels — 32-33
    a.  Desoto Regional in Mansfield, LA — 32
    b.  Lasalle General in Jena, LA — 33
8.  ESS & HCC Registered Offices or Registered Agent Addresses — 34-35
    a.  LA, TX, NM, CO, OK and AR — 34
    b.  MO, IL, KY, TN, NC, GA, AL, and MS — 35
9.  November 30 Letter about uncompensated hotel expenses — 36-37
10. Evaluation of Relator/Plaintiff as an Expert & Examiner — 38
11. American Academy of Emergency Medicine material — 39-46
    a.  Updated Position Statement on APP, 1/29/20 — 39-41
    b.  A Sad but True Story — 42-45
    c.  What it takes to make a doctor — 46
12. Louisiana laws about Advanced Practice Registered Nurses — 47-49
13. ESS/HCC hospitalist programs — 50-52
14. Texas Medical Association material — 53-55
    a.  Physician vs non-physician training differences — 53
    b.  Letter from David C. Fleeger, MD to President Trump — 54-55
15. Letter from the AMA and others to Administrator Verna — 56-59
16. Misdiagnosis and death in Oklahoma — 60-61
17. Healthcare Provider Starting Salaries by Specialty — 62
18. The Sabine Settlement — 63-64
19. Baldwin Bone and Joint — 65-66
20. Desoto Regional advertised they had a psychiatrist — 67-69
    a.  Press release — 67
    b.  St. Louis University FP/MHNP, online certificate — 68-69
21. Nine Graduate Nursing Schools with High Acceptance Rates — 70
22. List of 73 Nursing Masters Programs that are 100% online — 71-72

Primary Complaint:  Plaintiffs, the United States of America, the State of Louisiana, possibly fourteen other states, through the Relator, Terence James Alost, who is a citizen of Louisiana and whose mailing address is 2772 Windrush Way, Baton Rouge, LA  70809 submit this Complaint for Damages as follows:

## JURISDICTION AND VENUE FOR THE PRIMARY HEALTHCARE FRAUD COMPLAINT

1. This is primarily a *Qui Tam* action brought on behalf of the United States Government, through the Centers for Medicare and Medicaid Services ("CMS"), 31 USC § 3729, the Department of Defense for Tricare payments, the appropriate US agency for the Veterans Healthcare Administration payments, the State of Louisiana, and possibly fourteen other states against Defendants pursuant to the Federal False Claims Act, equivalent US laws concerning Tricare and Veterans Healthcare Administration fraud, the Louisiana Medical Assistance Programs Integrity Law, LSA R.S. 46:437.1 *et seq* and equivalent state healthcare fraud laws of the 14 other states.

2. This Court has jurisdiction for this action and these claims arising under the laws of the United States pursuant to 28 USC § 1331 *et seq*.

3. This Court has jurisdiction for this action in which the United States is a Plaintiff pursuant to 28 USC § 1345.

4. This Court has jurisdiction of the claims asserted in this action by the Federal False Claims Act.

5. This Court has jurisdiction of the pendent State claims asserted in this action under the express provisions of the Federal False Claims Act, 31 USC § 3732, and the general pendent jurisdiction of this Honorable Court.

6. Venue lies in this district under 31 USC § 3732 because some of the Defendants can be found in this district, all Defendants transact business in this district, and some of the acts proscribed by 31 USC § 3729 *et seq*. occurred in this district.

## JURISDICTION AND VENUE FOR THE SECONDARY CONTRACT COMPLAINTS
### Individual Capacity Claim[1]

7. Defendants and Plaintiff Terence J. Alost, MD MBA FAAEM entered into a written business agreement in which Dr. Alost provided emergency medicine services as a subcontractor to Defendant ESS at Defendant Desoto Regional in Mansfield as well as Lasalle General in Jena.  (See exhibits, pages 32-33)  Plaintiff did fulfill his obligations under this contract. Defendants did not fulfill their obligation to the Plaintiff and pay him as per

---

[1] By 1/23/20 Order of this Court, Plaintiff to separate out and clarify any individual capacity claims that exist.

his contract.  They repeatedly refused to pay him even after he requested several times that they do so.  (See exhibits, pages 36-37)

8. This is an individual capacity claim not of direct concern to the United States Government.

9. Venue, for this individual capacity claim, lies in federal instead of state court because Plaintiff lives in Louisiana and some of the Defendants are based in Texas.

10.  Venue, for this individual capacity claim, lies in this district because some of the Defendants can be found in this district and all Defendants transact business in this district.

**THE PLAINTIFFS**

11. The Plaintiff, the United States of America by and through its departments, the Department of Health and Human Services ("HHS"), including the Centers for Medicare and Medicaid Services ("CMS") within the HHS.  The United States of America is responsible for administering Federal and Health Care Programs including Medicare, Medicaid, Tricare and Veterans Health Administration benefits.

12. The Medicaid Program is a State and Federal Assistance Program to provide payment of medical expenses for low income and disabled beneficiaries.

Medicaid Program funding is shared by the Federal Government and those states participating in the program.  The primary purpose of the Medicaid Program is to enable each state to furnish medical assistance on behalf of families with dependent children, the aged, blind or disabled individuals, whose income and resources are insufficient to meet the cost of necessary medical services.  Nearly 75 million Americans were estimated to be enrolled in the Medicaid program as of 2018.

13. The Plaintiff, State of Louisiana, by and through its Department of Health and Hospitals, particularly the Louisiana Medicaid Program, is responsible for administering the joint and federal-state health care program known as Medicaid in the State of Louisiana.  In July of 2018, there were approximately 1,500,000 Louisiana Medicaid recipients[2].

14.  The Plaintiffs, the States of Texas, Oklahoma, Colorado, New Mexico, Arkansas, Missouri, Illinois, Kentucky, Tennessee, North Carolina, South Carolina, Georgia, Alabama and Mississippi have similar Medicaid programs in their states.  The estimated July 2018 number of Medicaid recipients in those states were: TX 4,300,000, OK 800,000, CO 1,300,000, NM 700,000, AR 900,000, MO 900,000, IL 2,900,000, KY 1,200,000, TN 1,400,000, NC

---

[2] Medicaid recipient numbers from www.healthinsurance.org.

2,000,000, SC 1,000,000, GA 1,800,000, AL 900,000 and MI 600,000
recipients.

15. Relator has information that the Defendants derive a substantial portion of
their revenue from the Medicare, Medicaid, and Tricare.  A smaller
percentage of their revenue is from health insurance particular in a rural
area like Desoto Parish covered by Defendant DRHS.  Additionally,
Defendants ESS and HCC declare that they specialize in rural emergency
and hospital medicine in Louisiana and 12 to 14 other states.  A higher
percentage of rural healthcare recipients have Medicare and Medicaid as
their payment form than in the more affluent suburbs of cities where more
patients have private health insurance.

16. If a hospital or health care provider is near one or several large military
installation(s), then that hospital or health care provider will see a higher
percentage of patients who have Tricare or VHA benefits.  There are several
military bases in central and northwestern Louisiana.  There may be large
military bases near other hospitals affiliated with ESS and HCC in the other
12 to 14 states where they operate.

**THE DEFENDANTS**

17.  Defendant Desoto Regional Health Systems Foundation (DRHS) is a

hospital and set of outlying clinics in Desoto Parish.  Per

www.desotoregional.com, it serves patients in "DeSoto, Sabine, and Red

River Parishes, parts of East Texas, and beyond."  In addition to the outlying

clinics, the principal place of business is in Mansfield.  This Defendant may

be served at 207 Jefferson Street, Mansfield, LA 71052.

18.  Defendant Emergency Staffing Solutions, Inc. (ESS) is an emergency

department contract management organization.  It obtains the emergency

department contract at client hospitals.  It hires healthcare providers to

work in those hospital emergency departments.  Some of those healthcare

providers may be employees while others, such as Relator, were and are

independent contractors.  ESS, itself, by Relator's direct observation, does

not have any apparent physician management, physician directors or

physician advisors[3].  Without physician supervision, ESS can run its business

like any other business: Profit is more important than patient safety.  ESS

sends bills to Medicaid, Medicare, Tricare, VHA, insurance companies and

---

[3] In November 2019, ESS did not list any physicians as part of their management team.  ESS does presently list a chief medical officer on their website.  That is new.   If the same physician was serving as the chief medical officer during the time of Relator's time with ESS, he would have been a figurehead because Relator had never heard of him.

"self-pay" patients for the services provided by its healthcare providers. According to www.essdoc.com, ESS has been in business 18 years and alleges to manage contracts in 78 hospitals in 13 states.  The Defendant may be served at 17304 Preston Road, Suite 1400, Dallas, TX  75252.  (For additional official addresses in the various states see exhibits, pages 34-35.)

19.  Defendant Hospital Care Consultants, Inc. (HCC) was founded in 2003 to manage contracts for the inpatient care within contracted hospital facilities, similar to the emergency medicine functions of ESS in its client hospitals. According to the website www.hccdoc.com, HCC manages contracts in "over 50 facilities."  According to that same website, it is licensed in 14 states in addition to Louisiana.  (Exhibits, page 2, map) According to their November 2019 website, HCC did not appear to have any physicians in management or as advisors.  Defendants ESS and HCC share the same office and share many of the same personnel.  The two defendants also have websites connected to each other.  (Exhibits, pages 50-52) The Defendant may be served at the same location as the Defendant ESS (above).

20.  Defendant Todd Eppler, FACHE, is a person of the full age of majority and is most likely a resident of Shreveport, Louisiana.  He may be served 207

Jefferson Street, Mansfield, LA 71052 or any other place that he may be found within this district.

21. Defendant Shelly Stewert is a person of full age of majority. She, most likely, is a resident of the State of Texas, in the Dallas-Fort Worth area. She may be served at 17304 Preston Road, Suite 1400, Dallas, TX 75252.

### THE RELATOR[4]

22. The Relator Terence James Alost, MD MBA FAAEM (hereinafter "Relator" or Plaintiff for the individual capacity claims) is a person of the full age of majority and a resident of the State of Louisiana, Parish of East Baton Rouge. Relator entered into a contract in December 2018 to provide Emergency Medical physician coverage at Desoto Regional in Mansfield, LA as an independent contractor under Defendant ESS. In April 2019, Defendant ESS convinced Relator to also provide Emergency Medical physician coverage at another ESS contract: Lasalle General Hospital in Jena, LA. Relator's first and last shifts at Desoto Regional were January 7, 2019 and June 22, 2019 respectively. Relator's first and last shifts at Lasalle General were April 23, 2019 and September 8, 2019, respectively. Relator is a board-certified Emergency Medicine physician, licensed in Louisiana

---

[4] As well as plaintiff for the individual capacity claims.

since August 9, 1988.  Relator's principal address is 2772 Windrush Way, Baton Rouge, LA  70809.

23. Relator has attached documentation, including exhibits, to this complaint which is incorporated by reference as if pled herein.

24. Relator will provide a disclosure to the Government of any and all evidence in his possession relating to this case as is required by the False Claims Act and to the Louisiana Department of Justice for the same.  Relator also will be happy to assist the other 12 to 14 states in any capacity they desire, either related to his time with Defendant ESS/HCC, as an Emergency Medicine expert knowledgeable in emergency care as well as malpractice[5], or as a physician very familiar with how healthcare institutions currently commit fraud, particularly in his specialty of Emergency Medicine.

25. Relator has submitted this "COMPLAINT FOR DAMAGES" in proper person. He is not an attorney.  Relator was informed by letters received January 27, 2020 that he must find an attorney to represent him concerning the representative claims in this case by February 22, 2020[6].  Relator began

---

[5] Relator has served multiple times as an expert sitting on Louisiana Medical Malpractice Review panels.  He has advised both medical malpractice defense attorneys and medical malpractice plaintiff's attorneys.

[6] Simply put the Government has put forth that non-attorneys are not permitted to represent the Government in court.  This is equivalent to the Relator's lawsuit:  In Louisiana and most other states, it is illegal for non-physicians to practice medicine unless they are under the supervision of a physician.

trying to secure an attorney immediately and plans to do so by the deadline.  Relator/Plaintiff was also instructed to amend his complaint concerning any individual capacity claims on that date.

26. Relator is a board-certified specialist in Emergency Medicine having practiced Emergency Medicine for three decades.  He is an expert in Emergency Medicine.  He is also an instructor of Emergency Medicine.  In his career, he has prepared approximately 1,000 physicians for their final examination to become board-certified in Emergency Medicine.  (See exhibits, page 38) He reserves the right, individually and as co-plaintiff with the United States of America, the State of Louisiana and the 12 to 14 other States, to obtain expert opinions from experts in the following fields: Healthcare law, Medical education, Nursing education, Nurse Practitioner education, Emergency Medicine, Hospital Medicine, Family Medicine, Internal Medicine, Psychiatry, Neurology, Cardiology, Pulmonology, Critical Care, General Surgery, Cardiothoracic Surgery and other specialties to be determined after completion of full discovery.

27. Relator reserves the right to have his anticipated future attorney(s) amend this complaint and expects that they will:

a. Relator followed the "Information on filing a lawsuit in Federal Court without a lawyer" provided to the public by the Court.  (United States District Court for the Western District of Louisiana)

b. Page 6 of 13, Paragraph 6 instructs pro se litigants to not try to "sound like a lawyer".

c. As a non-attorney, Relator filed this complaint for two reasons:

   i. People who defraud the state or federal government are stealing.  Relator is a taxpayer.  He does not want for people to steal tax dollars.  Such thieves, committing fraud, increase the national debt.

   ii. Much more importantly, Relator is a physician.  He is passionate that hospitals or other healthcare providers, motivated by greed, who harm patients should be stopped.  This filing, to the best of Relator's abilities, reflects that.

   iii. Relator anticipates that his future attorney(s) will rephrase this filing in a way that is more like what a lawyer would say instead of what a physician who cares about patients would say.

28. Relator reserves the right to attach any additional documentation should the US Attorney's Office so desire.

## FACTS AND ALLEGATIONS OF THE CASE

29. In 2017, Defendants began working on a planned "Nurse Practitioner Hospitalist Program".  Non-physicians had provided healthcare as employees or contractors of Defendant DRHS for some years.  In Louisiana, by law, non-physicians may practice medicine only if they practice in collaboration with a licensed physician.

30. Relator has specific and independent information that when the physicians on the medical staff were asked to consider the proposed "Nurse Practitioner Hospitalist Program" that there was considerable disagreement that the plan was a good one.  There was not universal agreement that the plan should go forward[7].

31. Around that time, Defendants contacted Bossier City attorney Pam Breedlove to ask her for an opinion letter supporting the "Nurse Practitioner Hospitalist Program".  She provided it on October 9, 2017.

32. In early December 2018, Julie Tusa, physician recruiter for Defendant ESS contacted Relator to see if he would be interested in providing some part-

---

[7] There still was not universal agreement amongst the Desoto Regional full-time physician staff that the plan is good.  At least one of the fulltime physician staff, in June 2019, firmly told the Relator that he felt the plan was unwise and unsafe and placed patients at risk for harm.  That physician firmly and somewhat loudly told Relator that he wouldn't trust 3rd year resident physicians to care for his patients, unsupervised.  Those physicians, he noted, had far more experience than an unsupervised 1st year nurse practitioner.

time Emergency Department physician coverage for the ED in Mansfield at the hospital of Defendant DRHS.  An agreement was reached in which Relator and Defendant would agree upon shifts and that Relator would be paid $135/hr plus hotel costs.  (See exhibit page 32)  A contract was signed by both parties.

33. Relator worked his first shift in the Desoto Regional Emergency Department on January 7, 2019.  At the time that Relator worked his first shift and for several months thereafter, he had no knowledge of the planned "Nurse Practitioner Hospitalist Program".  Although it was planned, it was not in effect yet.  At that time, admissions to Defendant DRHS were divided between Dr. Benjamin Leggio, a licensed physician trained in Family Medicine, with over 30 years' experience, and Dr. Denis Kamberov, a licensed physician trained in Internal Medicine.  These two physicians also provided primary care coverage at the Desoto Regional Family Medicine Clinic just across the street from the hospital.  In the opinion of the Relator, Drs. Leggio and Kamberov did a fine job caring for the patients admitted for in-patient care at Defendant DRHS.

34. The "Nurse Practitioner Hospitalist Program" began at Defendant DRHS in either May or June 2019.  The newly hired healthcare providers who would

be the hospitalists were Dr. Desai, a specialist in Internal Medicine, and Caleb, a nurse practitioner.

35. Relator knew that a hospitalist program was starting but he had no idea that it was entitled the "Nurse Practitioner Hospital Program" or how it was to be run.  Relator was quite familiar with physician-only hospitalist services in other hospitals.  Had he been informed by an administrator, physician or hospital employee that the hospitalist program had that specific name, his immediate response would have been, "I don't think that's legal in Louisiana."

36.  While working a shift in the Desoto Regional emergency department on June 17, 2019, Relator encountered, treated and diagnosed two patients that needed admission to a hospital: either at Desoto Regional or to one of the larger hospitals in nearby Shreveport.  Relator asked that the Hospitalist service be paged.  The call was answered by Nurse Practitioner Caleb. Without asking many, if any, clinical questions, Caleb quickly agreed to accept both patients to the hospitalist service.

37. Normally, emergency medicine specialists and consultants in other specialties discuss and, sometimes, vigorously debate over the telephone what to do with any given patient based upon clinical presentation and

data obtained during the emergency department evaluation.  Often, there is easy agreement about the appropriate disposition for a given patient.  Sometimes, there is not initial agreement at all.  Eventually, with rare exception, however, the two physicians do come to an agreement.  This is the standard practice of medicine throughout the United States of America.  Relator found it odd that very few questions were asked about the patients.  Some stroke patients and some pulmonary embolism patients are far beyond the capabilities of a rural hospital.  Only by asking questions, can a rural hospitalist figure out if a patient exceeds the capability of the hospital.

38.  Believing that Caleb, by Louisiana law, had to be under the collaboration and supervision of Dr. Desai, Relator entered orders into the computer for admission to that physician.  While entering those orders, Relator noticed that Nurse Practitioner Caleb was listed as one of the choices that could be picked, in the computer system, as the "admitting physician".  Relator found that quite peculiar.  First, Caleb isn't a physician.  Second, Relator knew, at that point, that such action was probably illegal.  In any event, Relator, at that point, just figured that it was an error by whomever in the hospital IT department had designed the computer ED→In-patient admission orders.

39. Within minutes, employees for Defendant DRHS confronted Relator and instructed him to "change the admitting physician" to Caleb.  Feeling that such an action was unwise, unsafe and illegal, Relator refused twice.

40. Relator became concerned that something was amiss.  He feared that the patients he had just admitted to Nurse Practitioner Caleb would be mismanaged.

41. For example, one of the patients that Relator admitted to Caleb had suffered a cerebrovascular accident, otherwise known as a "stroke".  There are standard tests and procedures that physicians learn in their training in either Internal Medicine or Family Medicine as part of the initial evaluation and treatment of stroke patients.  Such physicians learn this subject matter in their 4 years of pre-medical education, 4 years of medical school followed by a (minimum) 3 clinical years in their specialty-specific residency programs.  (See exhibits, pages 46, 53, 54, 56 and 57)  During medical school, the education is thorough.  Medical students learn the basics of every medical specialty.   After medical school, in residency, physicians become the experts in their chosen specialty.  Their education is specific: OBGYNs become experts on delivering babies among other things. Neurosurgeons become experts at doing brain and spine surgery.

42. All neurosurgeons, however, delivered a few babies in their medical school training days. They don't do it in their practice, however. If a lady, however, would go into labor on a trans-oceanic flight and the only health care provider on the plane was a neurosurgeon, then it would be that physician's duty to step up and nervously help out. That neurosurgeon spent 2 or more months as a medical student delivering babies.

43. Medical student training is diverse and thorough. To pass their examination to become a physician, all medical students must have basic knowledge of every specialty.

44. In contrast, nurses do not complete the same rigorous science-based medical education to become a nurse that medical students do to become a physician. Then, following that, a nurse attends a program to become a nurse practitioner. While there is great uniformity in US medical schools and residency programs, there is not uniformity in US Nurse Practitioner degree programs. Some Nurse Practitioner Degree programs are excellent and they turn out highly-competent excellent Nurse Practitioners. Many Nurse Practitioner Degree programs, however, are basically correspondence courses referred to despairingly, by some, as "diploma mills" that have very high acceptance rates, if not 100%, a comfortable and

easy curriculum and very high graduation rates.  The purpose of these comfortable on-line degree programs seems two-fold:

  a. First:  Make money, with not too much effort, by the "universities" that provide these programs.

  b. Second:  Allow the nurse to continue to work full-time as a nurse while they take the on-line course and transform their career from nursing to the much more lucrative profession of being a nurse practitioner.

  c. Quality of the degree program may not be important to many of the nurse degree candidates.  Since the majority of on-line nurse practitioner program advertise on how <u>quick and easy</u> it is to get their degree, then quality and thorough education does not seem to be their main selling point or, perhaps, their main emphasis.

  d. No nurse practitioner program is the equivalent of a physician residency program: Three or more years, in hospital and in classroom, under the supervision and instruction of experienced licensed physicians.

45. It is not easy for the public to tell the difference between a thoroughly trained nurse practitioner and one that basically bought their degree

without significant training or effort[8].  It is not easy for physicians to immediately tell the difference between a well-trained nurse practitioner and one that was poorly-trained.  However, even well-trained but recent nurse practitioner graduates do not have science training, medical training and experience that even a 4th year medical student has obtained.  (See exhibits, page 46)  No nurse practitioner has the specialty specific years of training, after medical school, that physicians must undergo to practice independently in Louisiana and most states.  The training of a nurse practitioner is much shorter and far less rigorous.

46. Relator became worried that the patients he had admitted would not receive care from a physician any time soon.  Relator then decided that he should order tests that were beyond the normal duties of a specialist in Emergency Medicine. For a stroke patient, those tests would normally be ordered by a Hospitalist physician, Family Medicine physician, Internal Medicine physician or Neurologist immediately or soon after the patient was admitted.

---

[8] To the best of Relator's knowledge, no state nursing board is differentiating between nurse practitioners who obtained their degree from a brick-and-mortar, physically in class and in hospital state or private university vs. an on-line graduate.  To the best of Relator's knowledge, there is absolutely no such thing as an on-line physician medical degree and Relator does not believe any state medical board would accept such a degree even if it existed.

47.  Once such test for the stroke patient was a "swallowing test".  Normally, people have a functional epiglottis which closes over and protects the airway and lungs when they swallow food or fluids.  After a stroke, especially a severe one, some patients have a dysfunctional epiglottis.  It does not close and protect the airway when the patient tries to swallow food or fluids.  Those foods and fluids will enter the lungs with catastrophic consequences including aspiration pneumonia, sepsis, disability and possibly death.

48. Physicians trained in Internal Medicine or Family Medicine order this "swallowing test".  If the patient fails that test, then the patient should not be allowed to eat or drink.   Instead, they should receive intravenous fluids for hydration and a feeding tube for liquid nutrition, either through their nose or surgically through their abdominal wall directly into the stomach.

49. To the best of his recollection, knowing these things, Relator asked the nurses to order and facilitate a "swallowing test".  The first nurse answered, "What's that?"  A second more experienced nurse answered, "We don't do that here anymore."  **Relator's concerns for the safety of the patients that he had just admitted to the hospital increased.  He feared that he had just admitted patients to a hospital that would harm them.**

50. Relator was disturbed by the fact that multiple hospital employees had instructed him to commit an act that he felt was dangerous for patient care, putting the patients' lives at risk as well as committing healthcare fraud. Relator e-mailed Defendant Todd Eppler to express his concerns at 2:11pm on June 18, 2019.

51. Defendant Todd Eppler's rapid e-mail response at 2:37pm was crystal clear: **Admit the patient as instructed to the Nurse Practitioner or be terminated.** In the response/threat e-mail, Defendant Todd Eppler included the October 9, 2017 opinion letter from the Pam Breedlove law firm.

52. Relator was startled by that response and figured that there must have been things going on that he had no knowledge of. He contacted full-time Desoto Regional physicians to ask what was going on.

53. The first staff member that Relator contacted, Dr. *****, stated that he, personally, also was opposed to the planned program but that he and others only relented when they were informed that the Breedlove opinion letter declared that the planned program was legal.

54. Relator assured Dr. ***** that the legal opinion expressed in Breedlove letter was wrong. Louisiana is not an independent practice state for nurse

practitioners.  It is illegal for nurse practitioners to practice medicine completely unsupervised in Louisiana.  It was irrelevant that an attorney wrote that it was ok.  She was wrong.

55. Dr. ***** then contacted his colleagues to discuss the Relator's concerns.

56.  Relator was invited to call in from his home in Baton Rouge to the next medical staff meeting, there in Mansfield, to discuss the Hospitalist program.

57.  Relator called in and presented, in detail, his argument as to why Defendants were doing something foolish, dangerous and illegal.

58.  Shortly after Relator spoke, Dr. ##### spoke to defend the program.  Although the reception for the conference call was not great[9], Relator believes that Dr. ##### asserted that the following groups had declared the new program to be legal and, in general, a great, if not fantastic, idea:

    a.  The Louisiana State Board of Nursing

    b.  The Louisiana State Board of Medical Examiners

    c.  Dr. Vince Culotta, Executive Director of the Louisiana State Board of Medical Examiners

---

[9] Relator asked for a transcript of the meeting.  This was not provided.

59.  Relator was startled and emailed Dr. Culotta Friday afternoon, June 21,

2019, to ask if that statement was true.

60. Dr. Culotta responded at 5:58 am, first thing, Monday morning, June 24,

2019, that it was **not true**. He asked Relator to attend the July 15, 2019

meeting of the LSBME to discuss the matter in front of the Board.  Relator

responded, via e-mail, that he would be out of the country on that date.  It

was agreed that Relator could send in the matter for discussion via written

letter presentation.  Dr. Culotta's instructions to Relator were to include

the following:

    a.  The facts of the matter.

    b.  Relator's concerns.

    c.  Specific questions for the LSBME to answer.

61.The presentation to the Board is attached.  (Pages 3-21 of the exhibits.)

Included, in that presentation, was a legal opinion by Carolyn Buppert,

MSN, JD[10] for the national publication, *Medscape*.  (Pages 19 & 20 of the

exhibits)  She answered this question, "In a hospital setting, where a nurse

practitioner is acting as a hospitalist, can the nurse practitioner be

considered the 'attending' for billing purposes if no other physician

---

[10] Ms. Buppert is an attorney with a Master's degree in Nursing.

hospitalist visited the patient?" **Healthcare attorney Buppert's answer was to the point: "No."** She went on further to explain that it would violate rules coming from Medicare's "Conditions of Participation".

62. The matter was discussed at the next meeting of the Louisiana State Board of Medical Examiners and was referred for legal opinion to attorneys for the Board.

63. On October 18, 2019, the LSBME responded.  Their determination is attached.  (Pages 24-28 of the exhibits)   Pertinent points are as follows:

   a. The unsupervised practice of medicine by a nurse practitioner hospitalist (without a physician being at least phone call away) is illegal in Louisiana.

   b. It appears that the unsupervised practice of medicine by a nurse practitioner hospitalist (without a physician at least being a phone call away) is illegal for all Medicare patients in every US State.  That would even include the states where HCC is licensed that do have independent practice rights for nurse practitioners:  New Mexico and Colorado.  (See exhibits, page 2)

   c. The LSBME has no authority when a nurse practitioner or hospital in Louisiana violates the law.  Instead:

    i.  If it chooses to, the Louisiana State Board of Nursing can discipline nurse practitioners that break the law.

    ii.  If it chooses to, the Louisiana Department of Health can discipline hospitals that break the law.

    iii.  On the other hand, if neither organization disciplines law-breaking nurse practitioners or hospitals, they may continue on.

  **d.**  Outside of discipline by the Louisiana state organizations, violations of healthcare laws, especially fraud, are punished by state and federal attorneys.   (**I.e. the co-plaintiffs in this lawsuit**.)

64.  There are other payors that also do not compensate unsupervised nurse practitioner hospitalists.  For example, Blue Cross and Blue Shield does not recognize NPs and NP-PCPs as hospitalists.  (See exhibits, page 29, second paragraph) **Blue Cross only reimburses physicians for hospitalist services** rendered directly to members.

65. How would a hospital or contracted management group get paid by Blue Cross when the hospital or management group provides in-patient hospitalist coverage by an unsupervised nurse practitioner hospitalist? Easy:  Lie about it and bill under a physician's NPI number.  **It's fraud**.  Such

fraud against BCBS works quite well until that provider gets caught.

Massachusetts BCBC outlines the rules for a MD/NP hospitalist team:

a. The NP must be a BCBS provider

b. The physician must be on-site when the care is rendered.

c. The physician must be actively involved in the patient care decision-making process.

d. It is important to note that Blue Cross also does not reimburse nurse practitioners that provide behavioral health services.  (Bottom of page 29, exhibits)  Defendant Desoto Regional's previously  labeled "psychiatrist" was and is not really a psychiatrist at all:  He is a nurse practitioner.  Defendant Desoto Regional cannot bill for his services as a "psychiatrist" because he is not one.  However, if they can get away with it, they can bill for psychiatric services that he provides using a physician's NPI number.  The Desoto Regional physicians are trained in Family Medicine and Internal Medicine.  Although all physicians receive a few months of training in Psychiatry in medical school and most Family Medicine physician specialists receive a few more months of training in Psychiatry during their residency, they are not psychiatrists.  Collaborative agreements between "specialized"

nurse practitioners and a physician are supposed to be with a

physician in that specialty, not with a physician in another specialty.

(See exhibits, pages 48-49)   There are no psychiatrists at Desoto

Regional.  Billing for the previously labeled "psychiatrist" was and is

probably fraudulent.

## BUSINESS MODEL OF ESS/HCC
**It is not physician led and, by its structure, violates Stark.**

66.  The business model for the services that defendants ESS and HCC provide

their client hospitals is, at first glance, fairly straight forward and, for those

not familiar with healthcare law, perhaps reasonable.

67.  Either as a consultant or as a separate business within the hospital

building, the ESS/HCC business model involves making more money by

increasing revenue and decreasing costs or overhead.

68. To increase revenue for a Hospitalist service, there are two simple factors:

   a. Admit more patients to the hospital.

   b. Charge every patient as much as possible.  (Since most patients don't

   pay their own bill, the business would actually bill Medicare,

   Medicaid, Tricare, Blue Cross etc. as much as possible.)

i. Revenue, per patient, is based upon what healthcare providers type into the patient record.  Contract management companies like ESS/HCC or hospitals and clinics like Desoto Regional can encourage healthcare providers to write or type into the record all of the things that they did in patient care and to make sure that all paperwork is filled out.  This increases revenue per patient.  It is ethical and legal.

ii. Conversely, contract management companies or hospitals can also instruct healthcare providers to type or write down things that are not true and never happened in order to increase billing.  **That's fraud.**  Such a practice works quite well until they get caught or turned in by a whistle-blower.

69. Concerning increasing admissions, Defendant HCC, on its website, boasts an average 20% increase in admissions for its hospital clients.  (See exhibits, page 50)  If true, that's an impressive number.  There are multiple ways to achieve that.  Some legal and appropriate and in the patient's best interest and some that are not legal and some that are not ethical.  These increased admissions include the following:

a. Admitting patients to the hospital that should never be or have been discharged home.  Some emergency medicine clinicians, both physicians and non-physicians, do not have adequate training. Educating those physicians to not discharge home at-risk patients is a great thing.  It would save lives and it is legal.  However, since ESS/HCC did not, until recently, have any apparent physician administrators or advisors, <u>at all</u>, it's a bit far-fetched that ESS/HCC should consider themselves a medical education specialist that knows more than their physicians.

b. Admitting more patients to the hospital that, on paper, fit admission criteria, but, in reality, might do fine as an outpatient.  This practice, if used, is not illegal.

c. Alter the documentation of patients that don't need admission to the hospital and don't fit admission criteria.  In other words, make it look like the patients, that are not that sick, fit admission criteria and then admit them.  **That's healthcare fraud**.

d. Admit patients to the rural hospitals that are far too sick to be kept in a rural hospital that lacks advanced treatment options that a patient urgently needs and where there usually are no physicians trained in

critical care or sub-specialties that a patient might urgently need. (See exhibits, pages 22-23)  While that is not straight-forward healthcare fraud, it is unethical.  When patients are harmed or killed by this practice, **it is medical malpractice**.  Such medical malpractice is much more likely to occur when healthcare is provided by untrained or undertrained and unsupervised non-physicians.

e. A glaring example occurred September 28, 2015, in El Reno, Oklahoma when an unsupervised non-physician had an 11-hour delay in diagnosis and necessary transfer of a critical patient.  (See exhibits, page 60-61)  It led to the death of that patient:

    i. Merci Health El Reno, was using "supervised-in-name-only" non-physicians, practicing outside of their scope of practice and their education to run their hospital.  Discovery at for the medical malpractice trial revealed:

        1. It was revealed in deposition that the emergency department medical director (an Oklahoma physician) who was responsible for collaborating with and supervising the non-physicians running the department rarely visited the department.

2. The department director was also on the credentialing committee.  The department director admitted in deposition that he or she had never seen or read any of the rules concerning the scope of practice of non-physicians in Oklahoma.

3. The director and others on the credentialing committee appears to have simply approved non-physicians to practice healthcare in fields that they were not trained or legally allowed to practice in.

4. There were and are rules by the Oklahoma state medical boards and nursing boards, limiting the number of non-physicians that could be supervised by a single physician. I.e. By law, there were maximum non-physician to physician ratio.  (The maximum number of nurse practitioners that may be supervised by one physician in Oklahoma was 2.)  Through discovery, the medical malpractice plaintiff's attorneys uncovered evidence that the hospital had sent out e-mails to bypass these safety requirements.  This included asking physicians,

practicing in other hospitals, who had never or very rarely even stepped inside of Merci Health El Reno to agree to be the "supervisors" of non-physicians that they had never met and probably never would meet.

5. Doing so would allow the hospital to get those "supervised-in-name-only" non-physicians to get approved.  The rules had been put in place by the Oklahoma legislature as a patient safety measure.

6. The emails uncovered by the plaintiff's attorneys revealed that the hospital was looking for "work arounds".  I.e.  They were looking for ways to "work around" the laws or safety measures put in place in Oklahoma so that they could increase the ratio of non-physicians to physicians, if not eliminate the need for physicians all together.

ii. The non-physician running the Merci Health El Reno emergency department on September 28, 2015 admitted in deposition that he or she was not trained or certified in acute care.  Practicing

Emergency Medicine was beyond their "Scope of Practice" allowed to them by the Oklahoma nursing board.

iii. The non-physician made a misdiagnosis:  They declared a 19-year-old college student to be a methamphetamine drug abuser[11] and then, reportedly, terminated further evaluation of her.

iv. The non-physician missed the correct diagnosis of pulmonary embolism.

v. The college student died because she was misdiagnosed by an admittedly inadequately trained healthcare provider practicing unsupervised and outside their scope of practice.

vi. The malpractice verdict against the defendant hospital was $6,190,000.

vii. Breaking Oklahoma law, this Oklahoma hospital was using less expensive but untrained and unsupervised non-physicians to save money and increase profit.  They, instead, lost a lot of money and apparently went out of business.

---

[11] Autopsy found no amphetamines in the deceased.

viii.  Merci Health El Reno's business decisions cost them their business.  **Far, far worse, it cost a young lady her life**.  It is <u>always</u> a tragedy when healthcare executives put profit before patient's lives.

f.  Pulmonary embolism, or a blood clot that has travelled to the lung, is the same diagnosis as one of the patients that Defendant Todd Eppler insisted Relator admit to a nurse practitioner (or else). Treatment for pulmonary embolism has evolved over the last few years:

   i.  Tiny blood clots in healthy stable patients can be managed as an outpatient with recently developed blood thinners.  That's new.

   ii.  Larger blood clots with only slightly abnormal vital signs in previously healthy patients can be admitted to a rural hospital just fine.

   iii.  Very large blood clots, such as in the Oklahoma case above, are beyond the capabilities of most rural hospitals, most physicians and, absolutely, almost all nurse practitioners.  Those patients

need, at a minimum, a "clot busting" drug such as tissue

plasminogen activator and a specialist in critical care medicine.

iv.  Patients with very, very large or "massive" blood clots are

doomed in almost all rural hospitals.  They need the immediate

combined services of cardiothoracic surgeons,

anesthesiologists, pulmonologists, cardiologists and, possibly,

hematologists or they will die.

v.  Knowing the difference between the four groups of pulmonary

embolism patients is beyond the scope of practice and

knowledge of many physicians because it is not their specialty.

It is definitely beyond the scope of knowledge, practice and

education of most nurse practitioners.

70. Besides increasing billing to make more money, a contract management

company or hospital, like the Defendants, can increase profit by decreasing

costs.  One of their major costs is the wages and salaries of healthcare

providers.  They can do the same thing that Merci Health El Reno did: use a

non-physician in a setting that they are not trained for.  They are much

cheaper.  (See page 62 of the exhibits.)  As shown in the data by Merritt

Hawkins, a contract management company or hospital can save the

following percentages on salaries, if, theoretically, the nurse practitioner

(NP) was as productive per hour as the physician that they replace:

    a. NP replacing a specialist in Family Medicine: 48% savings.

    b. NP replacing a specialist in Internal Medicine:  53% savings.

    c. NP replacing a specialist in Hospital Medicine: 54% savings.

    d. NP replacing a Psychiatrist: 54% savings.

    e. NP replacing a specialist in Emergency Medicine: 68% savings.

71. ESS/HCC is not the only contract management group (CMG) in the country

replacing its physicians with untrained or undertrained non-physicians.

Why is that?  The answer was allegedly revealed to an experienced board-

certified Emergency Medicine specialist, with over 25 years' experience,

when she was being terminated so that she could be replaced with a lower

cost non-physician in a large city in Louisiana.  Why was the physician being

terminated?  The physician executive allegedly didn't hold back.  **She**

**allegedly told the truth: It's "business".**  (See page 43 in the exhibits)

**72.** Do clinics, hospitals or CMGs usually tell the public that they are replacing

their physicians with non-physicians?  Generally, no.  They usually conceal it

from their patients.  And, although a bit more complex, they also often

conceal this fact from the payors: Medicaid, Medicare, Blue Cross etc.

**That's fraud.**

73. Do non-physicians conceal from their patients that they are not a

physician?  Some of them do.  Nurse practitioners that applied to a physical

or an on-line program to achieve a DNP degree have a Doctorate of Nursing

Practice.  They have a doctorate level degree, just like a PhD or JD has a

doctorate level degree, so they are not technically lying.  Most people,

however, when they hear someone referred to as a doctor, in a healthcare

setting, assume that person to be a physician.

### WHY THIS MATTERS.  BESIDES BEING FRAUDULENT, PATIENTS WILL BE HARMED IF NOT LOSE THEIR LIVES

74.  All businesses want to be successful so cost cutting is important.

However, for some critical industries, people's lives depend upon qualified,

trained and experienced workers.  An example is the airline industry.  One

of the expenses for the airline industry is pilot salaries.  Those pilots are

trained.  Could the airline save a lot of money firing all of their pilots and

replacing them with flight attendants who, after all, have been walking

around those planes.  They might have learned how to fly them.  Even if the

ticket was a bargain, no sane person would knowingly fly on such an airline.

75.  The same can be said for the healthcare industry.  It's very dangerous when untrained or undertrained healthcare providers are unsupervised.

76. Additionally, some non-physician degree courses are completely or close to completely online.  This is just a short list of things that cannot be learned on-line:

    a.  How to use a stethoscope for a chest or abdominal exam

    b.  How to palpate the abdomen for an abdominal exam

    c.  How to do an orthopedic joint exam

    d.  How to do a neurological exam

    e.  How to do a breast exam

    f.  How to do a pelvic exam

    g.  How to do a rectal exam

    h.  How to judge facial expressions and other actions as part of a psychiatric evaluation

77.  Non-physician healthcare providers can be created much faster than physicians.  (Five years vs a minimum of eleven years after high school.) They work for less money.   They certainly can be a valuable part of any healthcare team.  In Louisiana, as well as the majority of states, however, it is illegal for them to practice independently.  **It is also impossible to bill**

**Medicare, Medicaid or Blue Cross patient for the services provided by unsupervised nurse practitioner hospitalists without committing fraud:**

a.  It is fraud to bill under the nurse practitioners NPI number.

b.  It is fraud to bill under a physician's NPI number, instead, if the physician never had a single face-to-face interaction with the patient.

## STARK LAW VIOLATION

78.  In hospitals that have both an emergency medicine contract with ESS and a hospitalist contract with HCC, it seems fairly obvious that Stark Laws prohibiting making profit by self-referral are simply ignored.

79. For tax or business purposes, ESS and HCC are two separate corporations. However, since the two companies share the same website, same administrators, same office building and same employees, they appear to be two separate companies on-paper-only for tax and business purposes.

80. The overwhelming majority, if not over 90%, of the patients admitted to an HCC Hospitalist service are referred to them by an ESS Emergency Medicine service in most, if not every, ESS/HCC hospital contract.

**81.** According to its website ESS/HCC boasts about increasing admissions by

20% on average.  Every ESS→HCC admission is a self-referral that is

lucrative.

**82.**  It would be hard to imagine how they are not violating Stark rules every

single day in every single hospital where the two separate in name only

companies coexist.

## COMPARISON TO SIMILAR HEALTHCARE FRAUD CASES
## PREVIOUSLY PROSECUTED BY LOUISIANA AND THE USA

83. The Louisiana Attorney General's office has prosecuted cases of Medicaid

fraud. Per the AG's web-page, https://www.ag.state.la.us/MedicaidFraud):

Medicaid Fraud involves the intentional submission of a false or fraudulent claim
to the Louisiana Medicaid program.

The three primary Medicaid fraud schemes are:

1. Providers who bill the government for services they never performed.
2. Upcoding- Providers who bill the government for more expensive services than
they actually performed.
3. Kickbacks- Providers who make illegal payments to third parties in exchange for
business or referrals billed to Medicaid

Examples of Medicaid Fraud prosecuted by the MFCU in the past:

- A Kid-Med clinic in the New Orleans area submits billings for physician office visits
when the clinic has **no licensed physician**[12] on staff.

---

[12] Emphasis added.

- A physician bills Medicaid for **face-to-face**[13] office visits when she was vacationing outside the United States.

84. The Defendant's "Nurse Practitioner Hospitalist Program" is similar to, if not worse[14] than, the New Orleans area Kid-Med clinic.  Defendant Todd Eppler defiantly put in writing that there would be times that no licensed physician would be caring for hospitalized patients at Desoto Regional.   He wrote, "In your scenario, Dr. Desai would have to be on-call 24/7/365 which is impractical to say the least."  (See exhibits, page 12)  It is not only my "scenario" as Defendant Eppler called it, it is the law in Louisiana and most states.

85.  It wasn't and isn't a hard law for Defendants to follow: All that they had to do was find another physician for the nurse practitioner to collaborate with and to see admitted patients face-to-face on the days that Dr. Desai wanted off.  Easy.  However, the objective of the Defendants, apparently, was and is to make money.  To follow the law, they would have to enlist the services of physicians who would probably want to be paid.  It's cheaper and more profitable to just break the law, just like in El Reno, Oklahoma.

---

[13] Emphasis added.

[14] Except for a rare exception, patients going to a Kid-Med clinic are "well baby" outpatient visits.  Hospitalist practices take care of patients sick enough to be admitted.  The patients are far sicker.

86. Comparison can also be made with the case above in which a physician billed for face-to-face visits while they were enjoying a vacation.  As explained elsewhere in these pleadings, to bill Medicare legally for hospitalist services, the patient must have at least one face-to-face interaction with the physician whom the hospitalization is billed under.  If Dr. Desai, by the design of the "Nurse Practitioner Hospitalist Program," is the only physician then he must see every single patient admitted face-to-face at least once.  If he wants to take a vacation, he must be ready to fly back to northwestern Louisiana on short notice in order to make sure that the Defendants are not committing fraud.

87. The "Nurse Practitioner Hospitalist Program" was certainly poorly designed. However, poorly designed, illegal but profitable programs work fine until a government agency realizes that the healthcare provider is committing fraud.

88. Comparison can also be made with two Medicare/Medicaid fraud cases prosecuted by US Attorneys:

   a. The Sabine Settlement: In this case, some unscrupulous Baton Rouge optometrists did the following:

      i. Used the wrong provider billing number.

  ii. Billed the government more for glasses than they charged non-Medicaid patients.

  iii. Treated Medicaid patients rudely by herding them all into to a single weekday.

  iv. When customers returned a set of glasses in which the frame broke, they took the lenses out of the broken glasses and put them in a new frame.  They then charged the government for a completely new set of glasses.  They also sent the broken frame back to the manufacturer for a free replacement.

  **v.** **Although the optometrists certainly appear to have been unscrupulous crooks, no patients were harmed or killed.**

 b. Baldwin Bone & Joint: In this case, some Alabama orthopedic surgeons referred patients to a physical therapy clinic that they fully or partially owned:

  i. Doing so violated the Stark Law.   Their office→physical therapy clinic referrals violated the law.  **It is hard to imagine, however, in their Stark law violation, that the orthopedic surgeons made anything close to the far more profitable up to 70+ hospital ESS→HCC referrals.**

    ii.  In that clinic, athletic trainers and an exercise physiologist provided physical therapy.  The clinic billed for the services as if a physical therapist provided them.  That was also part of the fraud.

    iii.  **While it is certainly possible that some BB&J patients received some lousy physical therapy, it is highly unlikely that any patient suffered serious morbidity or death because of bad physical therapy.**

89.  This lawsuit is different than the last two.  No patients appear to have been harmed in either case above.  From the very beginning with his 6/18/19 e-mail to Defendant Todd Eppler CEO, (See exhibits, pages 9, 10 &11) Relator has been concerned for the health and safety of the patients: his patients and patients that are not his.  It is the job of the US Attorneys and the state Attorney's General to punish people who steal from the government.  It is an important job.  Relator is a physician.  His job is to care for patients.  He also feels that it is duty and has always been his duty to stop people who might harm or cause the loss of life of patients.  This case is far worse than the unscrupulous optometrists or the orthopedic surgeons that didn't know or don't follow the rules: **Patients will be harmed if not**

**die prematurely,** as shown in the tragic cases in Opelousas, LA or El Reno, Oklahoma, when non-physicians do not have supervision.

## EVIDENCE OF DECEIT AND DISHONESTY

90. Evidence that Defendants are willing to act in a misleading or unscrupulous fashion can be seen from both their actions and from their websites.  For Defendant DRHS:

   a. Defendant DRHS lists all of its healthcare providers on its "Physicians" page.  Four of the healthcare providers listed on that page are not physicians: Two are nurse practitioners, one is a social worker and one is a physician's assistant apparently working independently with no or minimal supervision in a clinic on the Texas border in Logansport, LA.  (See exhibits, page 10)  Many in the general public do not understand that those four healthcare providers are not physicians.  They will simply believe what the hospital tells them.

   b. Until they changed it, nurse practitioner Larry Allen was listed as a psychiatrist, trained at Tulane and double board-certified by the American Board of Family Medicine and by the American Board of

Psychiatry and Neurology.  In reality, Larry Allen did not train at

Tulane and he is not board-certified by either board.  Defendant

DRHS cannot resist being remaining dishonest to the public,

however, even in their initial attempt at "correction".  The initial

website correction specified that Mr. Allen received his "Medical

Education" from the "St. Louis University School of Medicine".  (See

exhibits, page 21)  Nurse practitioners do not take courses in medical

education at the St. Louis University School of Medicine.  They can

only take those courses if they apply to that medical school and are

accepted.

c.  It is possible, however, to take an on-line course to become a

Psychiatric Mental Health Nurse Practitioner from the St. Louis

University School of *Nursing*.  This is most likely the degree that Mr.

Allen possesses.  (Exhibits, pages 67-69)

d.  It certainly could be true the Mr. Allen is the most caring, most

devoted psychological counselor in northwestern Louisiana.  That

would be a <u>fantastic thing</u> for his patients.  However, he and Desoto

Regional do not have a right to lie about his credentials.  Lying to the

public is not a right, even if someone is well-meaning and caring. **Lying to the payors is fraud.**

91. Evidence that Defendants ESS/HCC are willing to act dishonestly and not honor contracts can be seen in the way that the Relator was terminated.

   a. Defendant and Relator (or Plaintiff for this individual capacity claim) agreed that Relator would work 3 days in July, 2019. These shifts were confirmed verbally and through text. The sudden last-minute termination, without due process, by Defendant Shelley Stewert violated that agreement and was an immediate loss of income for Relator of $4,860. Defendant Shelley Stewert would not provide written confirmation for the reason for the termination even when it was requested.

      i. Even though Plaintiff was worried about the unsafe and illegal "Nurse Practitioner Hospitalist Program", he would have finished out his final three days at the hospital. Plaintiff keeps his word.

      ii. If Plaintiff would have encountered an Emergency Room patient requiring admission and the hospitalist of the day was an unsupervised and illegal nurse practitioner, Plaintiff would

have transferred the patient to a hospital in nearby Shreveport. By doing so, the patient would be cared for legally and Plaintiff would not be forced to knowingly take part in fraud.

iii. Plaintiff has been accepting patients in transfer at hospitals with a "higher level of care" from doctors at a hospital with a "lower level of care" since 1989 or 1990.  He has also transferred patients from hospitals with a "lower level of care" to physicians at a nearby "higher level of care" since 1989 or 1990.  Plaintiff has decades of experience on both the sending and receiving ends of a transfer.

iv. Transferring a patient to a "same level of care" is very tricky and can be against the law[15].   If Plaintiff encountered a patient that needed admission but did not necessarily need admission to a "higher level of care", Plaintiff would have had a dilemma. He would take part in fraud admitting the patient in Mansfield or, alternatively, violate EMTALA if the patient did not truly need a "higher level of care" in Shreveport.

---

[15] The Emergency Medical Treatment and Active Labor Act (EMTALA)

v. Nonetheless, Plaintiff keeps his word and works when he promises to.  He would have made decisions in the best interests of the patient.  It would be difficult, however, if the accepting physician in nearby Shreveport asked, "Why can't y'all take care of the patient down there???"  Plaintiff would have been placed in the position to have to beg the physician on the other end of the line, "Please help me!!!  They are breaking the law here….  They don't have a physician running their hospitalist service!"

vi. Plaintiff would have done what was right for the patient.   It is the patients that count.

vii. In any event, Defendants knew, most likely on June 19 or 20, when Plaintiff didn't respond to Defendant Todd Eppler's threat e-mail, that they were going to terminate[16] him.  Had the Defendants notified Plaintiff then, he could have possibly found work in other locations.  The delayed termination prevented that.  Defendants owe Plaintiff for his wages.

---

[16] It was a very strange termination.  Plaintiff was terminated in Mansfield but not in Jena.  It was like being ½ fired.

    b.  Additionally, Defendant ESS/HCC, by contract originating in December, 2018, agreed to reimburse Relator for hotel costs. Relator repeatedly sent messages to Defendant requesting that the hotel costs, per contract, be reimbursed.  Communications were ignored.  Total unreimbursed hotel expenses are $2,427.61.

    c.  These unreimbursed wages and hotel costs are something more appropriate for "Small Claims Court" than for federal court, perhaps. That, however, is not the point.  This is the point:  If Defendants are unscrupulous enough to repeatedly cheat on their contract with the Plaintiff, what is to prevent them from also cheating, when they feel like it and think that they can get away with it, on other contracts such as contracts with the federal and state governments or with insurance companies?

92.  In any event, this Court has ordered Relator and Plaintiff to separate out and delineate any separate individual process claims by February 22, 2020. Relator cares far more about patients losing their lives than he does about the $7,287.61 in lost compensation.  **These, in any event, are Plaintiff's individual capacity claims.**

## DEFENDANTS ESS AND HCC ARE IN 12 TO 14 OTHER STATES

93. Relator is only witness to the operations of Defendants ESS and HCC in Mansfield and Jena, Louisiana.  Relator knows that they are complicit with healthcare fraud in Mansfield.

94. Defendant ESS, per its website, states that it has contracts in 13 states with 78 hospitals.

95. Defendant HCC, per its website, claims to be licensed in 14 states, not including Louisiana, as shown on the map in the exhibits, page 2.

96. Relator knows of healthcare fraud by Defendants in Mansfield, LA.  Is it widespread throughout the ESS and HCC contracts?  Full discovery will reveal the answer to that question.

WHEREFORE, Plaintiffs and Relator pray as follows:

97. Relator prays for a trial by jury in this matter.

98.  An order that Defendants cease and desist from submitting and/or causing the submission of any further false claims or from otherwise violating 31 USC § 3729 *et seq* and LSA R.S. 46:437.1 *et seq*.

99.  An order that Defendants cease and desist from misleading the general public, as well as payors for healthcare, (The US government, the State governments, insurance companies and self-pay patients) as to whom is

providing healthcare at their facilities.  (I.e. Non-physicians should not be called "physicians", for example.  If non-physicians are providing health care, this should be revealed to both the patients and the payors.)

100.     Judgement for the United States of America, the State of Louisiana and the 12 to 14 other States where Defendants provide healthcare in the amount of each and every false claim or false statement or false claim submitted until multiplied as provided by 31 USC § 3729 and LSA R.S. 46:437.1 *et. seq.* and the equivalent laws of the 12 to 14 other states, plus a civil penalty of not less than FIVE THOUSAND FIVE HUNDRED AND NO/100 ($5,500.00) DOLLARS nor more than ELEVEN THOUSAND AND NO/100 ($11,000) DOLLARS per false claim or statement, as provided by 31 USC § 3729 and LSA R.S. 46:437.1 et. seq., to the extent such multiplied penalty shall fairly compensate the United States of America, the State of Louisiana and the 12 to 14 other States for losses resulting in the various schemes undertaken by the Defendants together with penalties for specific claims to be identified at a trial on the merits after full discovery.

101.     Judgement for the Relator awarding him the maximum shares allowed pursuant to the Federal False Claims Act and the Louisiana Medical Assistance Programs Integrity Law cited and referenced hereinabove as

well as comparable maximum shares allowed pursuant to the relevant qui tam laws of the other 12 to 14 States.

102.    Judgement for the United States of America, the State of Louisiana, the 12 to 14 other States and the Relator against the Defendants awarding them all costs, including, but not limited to court costs, medical expert fees, legal expert fees and all reasonable attorney's fees incurred in the prosecution of this action.

103.    Judgement for the United States of America, the State of Louisiana, the 12 to 14 other States and Relator against Defendants for any and all of the damages available to them as a result of Defendants' violations of the Federal False Claims Act, the Louisiana Medicaid Assistance Programs Integrity Law and the equivalent laws of the 12 to 14 other States, and available to them pursuant to any other claims or causes of action arising under the statutes, common law, civil law, equity, or usage, and:

104.    Such other further general, equitable, and legal relief as justice so requires.

**CONCERNING THE INDIVUAL CAPACITY CLAIMS,** Plaintiff prays as follows:

105.  A trial by jury if the Court deems it necessary for this individual

capacity claim.  (Plaintiff will be satisfied with a quick trial in front of a judge

on this matter.)

106.  Defendants be ordered to pay for Plaintiff's hotel lodging (per

contract) plus judicial interest.

107.  Defendants be ordered to pay Plaintiff for the three mutually agreed

upon July shifts at Desoto Regional in Mansfield, LA plus judicial interest.

108.  Defendants be ordered to pay Plaintiff for attorney's fees in this case

and:

Such other further general, equitable, and legal relief as justice so requires.

Respectfully submitted,

Terence James Alost, MD MBA FAAEM
Appearing before this Honorable Court, *pro se*
*But only for now*
2772 Windrush Way
Baton Rouge, LA  70809
Telephone: (225) 205-4111
Alternative: (225) 776-0405